IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2020

**STATE OF TENNESSEE v. ERICK EUGENE JONES, JR.**

**Appeal from the Criminal Court for Greene County**
**No. 15-CR-188     John F. Dugger, Jr., Judge**

_____

**No. E2019-01737-CCA-R3-CD**

_____

The Defendant, Erick Eugene Jones, Jr., was convicted by a Greene County Criminal Court jury of two counts each of facilitation of felony murder in the perpetration of aggravated child abuse, facilitation of felony murder in the perpetration of aggravated child neglect, Class B felonies; aggravated child neglect, a Class A felony; one count of aggravated assault, a Class C felony; and one count of facilitation of aggravated assault, a Class D felony. *See* T.C.A. §§ 39-11-403 (2018) (facilitation of a felony); 39-13-102 (2014) (subsequently amended) (aggravated assault); 39-13-202 (2018) (felony murder); 39-15-402 (2014) (subsequently amended) (aggravated child abuse and child neglect). He received an effective sentence of fifty years. On appeal, the Defendant contends that (1) the evidence does not support his convictions, (2) the trial court erred by allowing autopsy photographs of the victims into evidence, and (3) the trial court erred by sentencing the Defendant to serve his sentences consecutively. We affirm the Defendant's convictions related to the victim T.T.[1] for facilitation of felony murder in the perpetration of aggravated child abuse, facilitation of aggravated assault, and aggravated child neglect. We reverse the Defendant's convictions related to K.E. for facilitation of felony murder during the perpetration of aggravated child abuse, facilitation of felony murder during the perpetration of aggravated child neglect, aggravated assault, and aggravated child neglect. We reverse the Defendant's conviction related to the victim T.T. for facilitation of felony murder during the perpetration of aggravated child neglect.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

---

[1] To protect the identity of minor victims, we will refer to these individuals by their initials.

Douglas L. Payne (at trial and on appeal), and J. Russell Pryor (at trial), Greeneville, Tennessee, for the appellant, Erick Eugene Jones, Jr.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Cecil C. Mills, Jr., and Ritchie Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Greene County grand jury indicted the Defendant and his fiancée, codefendant Kendra Tweed, for crimes involving the deaths of the codefendant's infant daughters, K.E. and T.T. The Defendant was charged with felony murder in perpetration of aggravated child abuse of K.E. in Count One, felony murder in perpetration of aggravated child neglect of K.E. in Count Two, felony murder in perpetration of aggravated child abuse of T.T. in Count Three, felony murder in perpetration of aggravated child neglect of T.T. in Count Four, aggravated child abuse of K.E. in Count Five, aggravated child neglect of K.E. in Count Six, aggravated child abuse of T.T. in Count Seven, and aggravated child neglect of T.T. in Count Eight. The Defendant had a jury trial separate from the codefendant.

At the Defendant's trial, Kristen Trombley testified that her sister, the codefendant, was the Defendant's girlfriend. Ms. Trombley said that in December 2014, the codefendant, the codefendant's three daughters, and the Defendant lived together. Ms. Trombley explained that the codefendant's two youngest daughters were K.E., age fifteen months, and T.T., age two months. Ms. Trombley said that on December 16, 2014, she took the codefendant to work at approximately 4:30 p.m. Ms. Trombley explained that on the following morning, her boyfriend, Joshua Hall, picked up the codefendant from work and took her home. Ms. Trombley testified that she had never seen any evidence that the victims had been abused. She said that she did not observe any problems with the victims on December 16, 2014, and that K.E. did not suffer from seizures.

Joshua Hall testified that Ms. Trombley was his girlfriend and that he recalled seeing the Defendant and the codefendant on December 17, 2014. He explained that he took the codefendant home from work at approximately 5:15 a.m. Mr. Hall said that he walked to the door, that the codefendant went into the home, and that he drove away.

Kevin Ayers testified that he was a Greene County 9-1-1 dispatcher and that at 7:48 a.m. on December 17, 2014, he received an emergency call regarding a child. Mr. Ayers said that he spoke with a woman, later identified as the codefendant, who said that her child was not breathing. A recording of the call was played for the jury. At the beginning of the call, the codefendant told Mr. Ayers that her "baby is dead." The codefendant gave Mr. Ayers her address and said her baby was not breathing. The codefendant screamed, and the Defendant began talking with Mr. Ayers. Mr. Ayers instructed the Defendant on how

-2-

to perform CPR, and the Defendant told him that, despite the Defendant's attempts at CPR, the baby still was not breathing.

Greeneville Police Department (GPD) Officer James Craft testified that on December 17, 2014, he went to the Defendant's home. He explained that when he arrived, he observed two emergency medical technicians (EMTs) attempting to resuscitate an infant. Officer Craft said that the Defendant and the codefendant were in the home. Officer Craft explained that the codefendant sat on a couch and that the Defendant stood silently on the other side of the room. Officer Craft said that one victim was in an ambulance and that the other victim was in a "bouncy seat" inside the home. Officer Craft explained that he believed the child in the bouncy seat was asleep, but when someone picked up the child to remove her from the home, the child was nonresponsive.

Officer Craft testified that there was a strong smell of Pine-Sol in the home. He explained that the Defendant told Officer Craft he had heated the cleaning product in a pan on the stove "to keep the musty smell down." Officer Craft stated that the Defendant explained that he was taking care of the two children while the codefendant worked, that the older child had been "acting funny" during the night, and that the Defendant called the codefendant to return home from work to check on the child. Officer Craft said the Defendant told him that the codefendant came home and determined the child was okay and that she and the Defendant went to bed. Officer Craft said that the Defendant informed him that an unnamed woman had been at the home at approximately 10:00 p.m. and "smoked crack" in the bathroom but that the Defendant asked her to leave because he did not allow drug use in his home. Officer Craft stated that the Defendant said that after the woman left the home, no one else came to the home other than the codefendant. Officer Craft said that he took multiple photographs of the home.

Greeneville Fire Department Lieutenant and EMT Michael Kinser testified that on December 17, 2014, he responded to the Defendant's home. Lieutenant Kinser said that he entered the home and saw an infant in a bouncy seat. He explained that he walked past the infant and entered a bedroom further inside the home. Lieutenant Kinser said that another child lay on a bed, wearing only a diaper. Lieutenant Kinser said that he and another EMT determined that the child was not breathing and that the other EMT performed CPR. Lieutenant Kinser said that the Defendant stood above the child and appeared to have a "a very calm demeanor" and talked on the telephone. Lieutenant Kinser said that he observed the child had bruises and had fixed and dilated pupils, which he stated often indicated brain death or damage. Lieutenant Kinser explained the child did not respond to life-saving treatments and was moved to an ambulance. Lieutenant Kinser said that he attempted to speak with the codefendant in order to obtain a medical history but that he was unsuccessful because she was in the front yard crying and upset. Lieutenant Kinser stated that he tested the air quality within the home and found no environmental abnormalities.

Greene County Emergency Medical Services paramedic Seth Smith testified that on December 17, 2014, at approximately 7:45 a.m., he responded to the Defendant's home. Mr. Smith explained that when he arrived, a woman stood in the front yard, who appeared anxious and screamed "save my baby." Mr. Smith said that he and his partner entered the home through the front door and that fire department personnel informed them that K.E. was not breathing, had no heartbeat, and had fixed and dilated pupils. Mr. Smith said he observed fire department personnel performing chest compressions and ventilation. Mr. Smith stated that he took over the care of K.E. and carried her to the ambulance, where he administered chest compressions, intubation, and medications. Mr. Smith explained that fixed and dilated pupils could indicate brain death.

Mr. Smith testified that as he treated K.E., a police officer brought T.T. to the ambulance. Mr. Smith said that T.T. was not breathing and had no heartbeat and that he began performing lifesaving measures on her. Mr. Smith explained that there were approximately five adults in the ambulance attempting to revive K.E. and T.T. Mr. Smith said that the ambulance took the victims to a hospital, where they were treated. Mr. Smith said that the lifesaving measures had no effect on K.E. and T.T., that he never observed signs of life in the victims, and that he remained with the victims until they were pronounced dead.

Ashley Musgrove, the codefendant's sister, testified that in December 2014, the codefendant, K.E., and T.T. lived with the Defendant. Ms. Musgrove stated that she was not aware that either victim had any adverse health conditions. Ms. Musgrove said that she saw K.E. on December 15 and that she appeared healthy. Ms. Musgrove stated that she received a call from the codefendant on December 17 and that the codefendant sounded "frantic" and screamed that something was wrong with K.E. Ms. Musgrove said that she spoke with the Defendant, who also told her that something was wrong with K.E. Ms. Musgrove explained that she went to the Defendant's home and that when she arrived at the home, she observed an ambulance and police cars parked outside the home. Ms. Musgrove said she walked into the living room of the home and saw a police officer and the codefendant, who was "screaming and crying." Ms. Musgrove said that she decided she needed to take T.T. away from the home. She said that she picked up T.T. from her bouncy seat and that as soon as she touched T.T., she felt that the victim was cold and knew that T.T. was dead. A police officer took T.T. from her and carried T.T. to the ambulance. Ms. Musgrove took the Defendant and the codefendant to the hospital where the victims had been taken.

GPD Detective Kevin Guinn testified that on December 17, 2014, he investigated the victims' deaths. Detective Guinn said that when he and Detective Thacker arrived at the hospital, he learned that both victims were dead. Detective Guinn said that he began collecting information and discovered that the Defendant was the last person to see the victims alive at approximately 5:00 a.m. that morning. Detective Guinn stated that the Defendant agreed to give a statement and that he and Tennessee Bureau of Investigation

(TBI) Special Agent Chris Wilhoit interviewed the Defendant at the police station later that day. Detective Guinn identified a copy of the Defendant's statement and read it to the jury.

In his statement, the Defendant said that the codefendant had awakened one morning, before the Defendant moved into the home, to discover that K.E. was not breathing and that her skin was blue. The Defendant said that K.E. had been hospitalized once because she had "MRSA." He explained that on another occasion, K.E. had been taken to the hospital because she had a problem breathing. The Defendant said that K.E. had breathing treatments at the hospital and then more breathing treatments at home for approximately one month. After T.T. was born, the Defendant moved into the home with the codefendant and the victims. He said the codefendant informed him that K.E. had been having seizures. The Defendant explained that T.T. had no health problems. The Defendant stated that the codefendant took "Xanax, Roxies, and Subutex" and "smoke[d] weed." The Defendant said that K.E. was "smacked on the hand" as a form of punishment and that K.E. was not "spanked." He explained that the only people to care for K.E. were the codefendant's father, the Defendant, and Ms. Trombley. The Defendant said that on December 16, 2014, K.E. began having a seizure and that he called the codefendant. He explained that the codefendant came home at approximately 1:00 or 2:00 a.m. on December 17. The Defendant explained that K.E. was fine and eating and that T.T. was in her bouncy seat drinking from a bottle. He said K.E. went back to work at 2:50 a.m. The Defendant stated that he put K.E. to bed on the sofa because she disliked her crib and that T.T. slept in her bouncy seat. The Defendant said he went to bed at 5:00 a.m. and that the codefendant returned home at 6 a.m. He explained that T.T. was crying when the codefendant came home and that they gave T.T. a bottle and put her to bed. The Defendant said that he did not check on K.E. at this time and that he returned to bed. The Defendant stated he awoke around 7:00 a.m. and found K.E. lying on her stomach on the sofa. He said her head was turned so that her right ear was facing upward and that she had blue spots in her ear. The Defendant explained that he removed a blanket from K.E. and discovered that her skin was blue. The Defendant said he called for the codefendant to come into the room and to call 9-1-1. The Defendant said that he spoke to the 9-1-1 operator, who told him how to perform CPR. The Defendant stated that he placed K.E. on the bedroom floor and performed CPR on her until the ambulance arrived, when paramedics took over her care. The Defendant explained that Ms. Musgrove came to the home to take T.T. away from the home and discovered that T.T. was not breathing. The Defendant also explained that the day before, he boiled Pine-Sol to make the home smell better. He said that K.E. ran through the house and hit her left eye on a table. The Defendant stated that a week before the incident, he argued with the codefendant and moved out of the home for several days. He said that when he returned, K.E. had two scratches on her left cheek and that K.E. told the Defendant it happened while K.E. played. The Defendant explained that several adults were in the home on December 16. He said that everyone left and that another woman arrived at the home later. The Defendant explained that he found the woman in the bathroom "smoking crack" and that he made her leave. The Defendant stated that on December 16, from 4:00 p.m. to 8:00 p.m., he boiled Pine-Sol in a pan. The Defendant

-5-

said that he had a headache and began feeling sick and that the codefendant cared for him before she went to work. He said that he was dizzy and vomited multiple times. The Defendant also stated that on December 16, K.E. placed a cigarette butt in her mouth and that the Defendant used his right hand to spank her on the bottom. The statement was received as an exhibit.

Detective Guinn testified that on the same day he interviewed the Defendant, the Defendant consented to a search of his cell phone.

Dr. E. Hunt Scheuerman, a forensic pathologist, testified that he performed an autopsy on K.E. Dr. Scheuerman's autopsy report was received as an exhibit. Dr. Scheueruman explained that he reviewed K.E.'s medical history, including her medical records, and that nothing in the records indicated that K.E. had a seizure disorder. Dr. Scheuerman stated that K.E.'s cause of death was a transection of the upper cervical spinal cord due to blunt impact of the cord and that the manner of death was homicide. Dr. Scheuerman explained that the blunt force completely separated the base of K.E.'s brain with the top of her spinal cord. He said that K.E. also suffered other injuries. Dr. Scheuerman identified a photograph taken during K.E.'s autopsy and said that it showed bruises on the left side of her face, a bruise on her left ear, and an abrasion on the left side of her head. He explained that the bruises were consistent with someone grabbing K.E.'s face. Dr. Scheuerman said that K.E.'s upper lip, lower lip, and the frenulum, the "fleshy bridge between the lip and the gum," were lacerated. Dr. Scheuerman identified a photograph of K.E.'s head. He explained that the hair on her head had been shaved during the autopsy and that she had a bruise on the back of her head. He stated that he also found bruising on the left and right sides of her head. Dr. Sheuerman identified another photograph of the back of K.E.'s head that showed where her spinal cord had been completely severed at the base of her brain. He explained that when the spinal cord was lacerated, the blood vessels within the spinal cord caused bleeding at the base of the brain. Dr. Scheuerman stated that aside from injuries caused by vehicle collisions, he had never seen such an injury to a child.

Dr. Scheuerman testified that lividity was caused by the settling of blood after death. He stated that he saw red marks on K.E.'s skin on the front of her body and that these marks were signs of lividity. Dr. Scheuerman said that, hypothetically, if a child were placed on her stomach, he would expect to see signs of lividity on the front side of her body. He stated that he found a collection of blood in K.E.'s abdominal cavity and that this was abnormal. Dr. Scheuerman said that K.E. also had bruising on the upper portions of her calves, the back of her left thigh, her left buttock, and lower back. He explained that K.E. also had bruising around her left eye, on her left ear, and a smaller bruise on her right ear. Dr. Scheuerman said that K.E. also had a small bruise on the top of her head.

Dr. Scheuerman testified that he conducted an autopsy of T.T., and the autopsy report was received as an exhibit. He stated that there was a complete transection to T.T.'s

spinal cord at the base of her brain. He explained that the blood vessels associated with the severed spinal cord caused bleeding and the pooling of blood at the base of her brain. Dr. Scheuerman concluded that T.T.'s cause of death was cervical spinal cord transection due to blunt force trauma of the neck and that the manner of death was homicide. He explained that when connected, the spinal cord transmitted signals between the brain and the body. He stated that severing the spinal cord at the base of the brain caused a loss of nervous system stimuli and resulted in death. Dr. Scheuerman explained that hyperextension of the neck typically caused this type of injury. He said that neck muscles in children were weak and that their heads were bigger relative to the rest of their bodies. He stated that if something caused a child's neck to "snap back," it put pressure on the spinal cord, potentially causing a laceration of the spinal cord.

Forest Clevenger testified that he owned a pawn shop, which the Defendant visited on December 18, 2014. He explained that the Defendant brought in a new, large-screen television and sold it to Mr. Clevenger. The purchase agreement for the television was received as an exhibit. Mr. Clevenger said that the Defendant was accompanied by the codefendant and that the couple appeared "carefree" and "joyous." He explained that the codefendant received a telephone call, and during the call, she appeared "solemn and somber." He said that the codefendant became "jovial" after the call ended. He said the Defendant and codefendant looked at wedding rings and that the codefendant said the Defendant "needed to get her wedding ring quickly." Mr. Clevenger stated that a few hours after the Defendant and the codefendant left his shop, he saw a report regarding a stolen television. He said that he realized the stolen television was the same television he had purchased from the Defendant and that he called the police.

TBI Agent Kendall Barham testified that at approximately 2:00 p.m. on December 19, 2014, he and Agent Wilhoit interviewed the Defendant. A recording of the interview was played for the jury. In the recording, Agent Barham asked the Defendant what happened the night before the victims died. The Defendant said that at 10:00 p.m., he called the codefendant because K.E. was having a seizure. He said that the codefendant came home from work and that, by the time she arrived home, K.E. was fine. The Defendant said that the codefendant returned to work, and later Kurtis Lewis, K.E.'s biological father, came to the home. The Defendant explained that he and Mr. Lewis smoked marijuana and that a couple of other people came to the porch of the home, where the Defendant sold them drugs. The Defendant stated that he received a call from a woman interested in purchasing drugs from him. He explained that he did not trust the woman to come to his home and that he arranged to meet her elsewhere. The Defendant stated that he asked Mr. Lewis to remain in the home to watch the victims while the Defendant left to meet the woman. The Defendant said that he returned home after approximately thirty minutes and that Mr. Lewis left the home around 3:00 a.m. The Defendant said he checked on K.E. and discovered that she was not breathing and did not appear to have a heartbeat. The Defendant explained that he panicked because he had drugs in his home and that he flushed the drugs down the toilet and called Mr. Lewis, who did not answer his phone. The

Defendant said that at 5:00 a.m., the codefendant returned home, that he did not tell her anything, and that they went to bed. He said that at 7:00 a.m. he checked on K.E. and noticed that her skin had turned blue. The Defendant stated that he "screamed" for the codefendant and instructed her to call an ambulance. He said that the codefendant called 9-1-1 and that he spoke with a dispatcher, who instructed him how to perform CPR. The Defendant said that he attempted CPR but that K.E. did not respond. He said emergency responders and the police arrived. The Defendant said he did not know T.T. was dead until Ms. Musgrove discovered her nonresponsive in the bouncy seat. The Defendant explained that he did not want to blame Mr. Lewis but that the Defendant did not know what had happened to the victims. The Defendant said Mr. Lewis called the Defendant the same day the victims died and threatened the Defendant. The Defendant said he saw Mr. Lewis drive by the Defendant's home. The Defendant said that he was wrong not to call the codefendant when he initially found K.E. nonresponsive. He stated that the reason he did not call for help was because he did not want to be caught possessing drugs. The recording and a transcript of the interview were received as exhibits.

TBI Agent Scott Lott testified that on December 19, 2014, at approximately 5:00 p.m., he and Agent Barham interviewed the Defendant. The interview was played for the jury. Agent Lott testified that following the recorded interview, the Defendant gave an additional written statement, which Agent Lott read to the jury. In the written statement, the Defendant stated that when he left the home while Mr. Lewis watched the victims, K.E. and T.T. were still awake. He explained that K.E. watched television and that T.T. kicked her feet in her bouncy seat. The Defendant said that when he returned home, K.E. was sleeping on her stomach on the couch and T.T. was sleeping in her bouncy seat. He explained that he did not "pay too much attention" because he was "high."

Agent Lott testified that he prepared a cell phone summary of the use of the cell phones associated with the Defendant and the codefendant from the records he obtained from wireless carriers. The summary indicated the following: The codefendant called the Defendant at 9:38 p.m., 10:24 p.m., and 10:36 p.m. on December 16, 2014, and they spoke briefly each time. The codefendant called the Defendant at 11:29 p.m., but the Defendant did not answer. The Defendant called the codefendant at 11:30 p.m., and they spoke briefly. The following text messages were exchanged between the Defendant and the codefendant:

- The codefendant to the Defendant at 11:35 p.m.: "I luv u very much! goodnight babe"

- The Defendant to the codefendant at 11:36 p.m.: "I love u more nite babe"

- The codefendant to the Defendant at 1:09 a.m.: "i cant sleep"

The codefendant called the Defendant at 4:50 a.m., but he did not answer. The Defendant called the codefendant at 5:48 a.m., and she did not answer. The codefendant called the Defendant at 5:49 a.m., and they had a brief conversation. The codefendant called 9-1-1 at 7:48 a.m. Agent Lott said that based on the cell phone records, he was unable to corroborate the Defendant's statements.

Dr. Remy Sagadraca with Takoma Regional Hospital Emergency Department testified that in December 2014, K.E. and T.T. were brought to the hospital's emergency room. Dr. Sagadraca said that T.T was age two months and was in cardiac arrest. He attempted multiple lifesaving measures but all were unsuccessful. He observed that her pupils were nonresponsive, that her skin was cold, and that she had bruises on her buttocks. Dr. Sagadraca said that she had "areas of ecchymosis" around her buttocks, ears, and neck. He also attended K.E. and said that she was in cardiac arrest and was not breathing. He attempted resuscitation but was unsuccessful. Dr. Sagadraca said that he and other medical personnel treated the victims for approximately thirty minutes but that the victims never responded and were cold. He said that he instructed a nurse to take the rectal temperatures of the victims and that K.E.'s temperature was 90.5 and T.T.'s temperature was 90.6.

TBI Special Agent Chris Wilhoit testified that he investigated the deaths of K.E. and T.T. Agent Wilhoit said that on December 17, 2014, he and Detective Guinn interviewed the Defendant. Agent Wilhoit recalled that the Defendant said that he had watched the victims the evening before they died. He said that the Defendant mentioned Kurtis Lewis as being at the home but that the Defendant did not blame Mr. Lewis for the deaths. Agent Wilhoit explained that the Defendant said that Mr. Lewis, Eureka Jordan, Zach Moore, and a woman named Koda were in the home the evening before the victims died. Agent Wilhoit said that the Defendant did not blame the codefendant for the deaths, either. Agent Wilhoit stated that the Defendant did not explain what had happened to the victims. However, the Defendant mentioned that he had boiled Pine-Sol to mask a bad odor and that he became sick.

Agent Wilhoit testified that on December 19, 2014, he assisted Agent Barham in interviewing the Defendant again. He said that at the beginning of this interview, the Defendant's story was consistent with the Defendant's December 17, 2014 statement. Agent Wilhoit said that after this December 19 interview, the Defendant gave another statement to Agent Lott. Agent Wilhoit said that he was aware of the contents of the statement to Agent Lott and that Agent Wilhoit could not corroborate the Defendant's statement and later told Agent Lott.

In the December 19 interview with Agent Wilhoit, the Defendant stated that he called the codefendant to come home from work because K.E. was having a bad seizure. The Defendant explained that during her seizure, K.E. bit her tongue and that it bled. He stated that the codefendant came home from work, checked K.E., and fed her. The Defendant said that K.E. slept on the couch and seemed fine and that T.T. was asleep in

her bouncy chair. He said that the codefendant returned to work. The Defendant said that the codefendant came home from work and that they went to bed. He said he got up at 7:00 a.m., checked on K.E., and discovered that she had blue skin and blue spots on her ear. The Defendant said that he was alone with the victims that night and that he did not do anything to harm them. The Defendant said that he did not leave the victims alone with Mr. Lewis. He stated that Mr. Lewis was alone in the living room with the victims but that the Defendant never went further away than the kitchen. However, the Defendant admitted that he left the home to sell drugs and that Mr. Lewis was alone with the victims for approximately thirty minutes. The Defendant said that he returned home and Mr. Lewis left. The Defendant said he attempted to call Mr. Lewis, but Mr. Lewis did not answer. The Defendant said that he did not check on the victims after Mr. Lewis left but that he should have. The Defendant stated that it was his fault the victims were dead, that he should not have left his home, and that Mr. Lewis did not harm the victims. However, the Defendant stated that he blamed Mr. Lewis for the victims' deaths because the victims were fine until he left them alone with Mr. Lewis. The Defendant also contradicted himself by saying that he immediately checked on the victims after Mr. Lewis left his home. The Defendant said that Mr. Lewis called and threatened him later. He said that Mr. Lewis was jealous of the Defendant's relationship with the codefendant.

Agent Wilhoit testified that the Defendant also gave a statement to Investigator Teddy Collingsworth and Agent Wilhoit later that day at about 9:00 p.m. Agent Wilhoit said that the Defendant did not name Mr. Lewis until after Agent Wilhoit had mentioned Mr. Lewis.

Agent Wilhoit testified that at approximately 9:00 p.m. on December 19, 2014, he and Investigator Collingsworth interviewed the Defendant. In the interview, Agent Wilhoit told the Defendant his story was "not panning out." Agent Wilhoit said that he did not believe the Defendant left the home to sell drugs to a woman at "Little Top." Agent Wilhoit explained that a surveillance video of the location showed no evidence that the Defendant had been there. The Defendant insisted that he left his home to meet a woman at Little Top. The Defendant said that he left the victims at home with Mr. Lewis. The Defendant said when he returned home, Mr. Lewis told him the victims were asleep. The Defendant said that K.E. was on the couch, that T.T. was in the bouncy seat, and that they both appeared to be sleeping. The Defendant said that he did not check on the victims when he returned and that it was not until later he discovered they were dead. He said that he did not call 9-1-1 because he "was high" and had drugs in his possession. The Defendant stated that he did not discuss the victims' deaths with the codefendant and fabricate a story regarding the victims' deaths. The Defendant said that he was not at home when the victims died. The Defendant stated that Mr. Lewis called him while the Defendant was out, and Mr. Lewis said that he "had something hot" for the Defendant. The Defendant explained that Mr. Lewis was unhappy about the Defendant's dating the codefendant. The Defendant said he let Mr. Lewis into his home because he was K.E.'s biological father. The Defendant stated that both victims were fine when he left the house and that Mr. Lewis

-10-

must have done something to the victims while he was gone. Agent Wilhoit said that during the December 19, 2014 interviews, the Defendant never wavered on his claim of Mr. Lewis's involvement in the victims' deaths.

Agent Wilhoit testified that on December 20, 2014, he and Investigator Kenni Carter interviewed the Defendant. A recording of the 3:00 p.m. interview was played for the jury. During the interview, the Defendant said that he had spoken with his mother earlier that day and that he wanted to tell the officers the truth because he had lied during his previous interviews. The Defendant stated that the codefendant wanted to blame the victims' deaths on Mr. Lewis and that she told the Defendant to implicate Mr. Lewis. The Defendant said that at approximately 10:00 p.m. on the night of the victims' deaths, he called the codefendant at work and told her K.E. was having a seizure. He said that the codefendant came home from work at approximately 11:00 p.m. and that she was home until approximately 12:00 a.m. or 1:00 a.m. He explained that she borrowed a van from her employer to drive home. The Defendant said that K.E. had a second seizure and that the codefendant picked her up and shook her until she stopped moving. He said that they started to "freak out" and that they "knew" K.E. was dead. The Defendant said he told the codefendant that they needed to call the police or an ambulance, but she refused, picked up T.T., and shook her and said why "did it have to be [K.E.]?" He stated that K.E. died at approximately 12:00 a.m. and that the codefendant began shaking T.T. a few moments after she killed K.E. He said that she shook T.T. for a couple of minutes and that he tried to stop her and took T.T. and placed her in her bouncy seat. T.T. was grunting when he placed her in the bouncy seat. He explained that he was not sure T.T. was dead and did not check on her until Ms. Musgrove discovered her the next morning. The Defendant stated that Mr. Lewis had nothing to do with the victims' deaths but that the codefendant instructed him to lie and blame Mr. Lewis. He said that Mr. Lewis came to the home that night and stayed until 3:00 a.m. The Defendant said that Mr. Lewis arrived after the victims had been shaken and that the Defendant did not believe Mr. Lewis knew they were dead. The Defendant stated that the codefendant told the Defendant they would move and start over. The Defendant explained that he flushed cocaine and marijuana and did not call 9-1-1 because he was "freaking out" and because the codefendant said "to wait until she got off work." Regarding the text message exchange between the Defendant and the codefendant, the Defendant said that the codefendant was at the house and had attempted to text her father to say "goodnight" and that she accidentally texted the Defendant. The Defendant said that he decided to tell the truth because the codefendant "turned on" him and was no longer speaking to him. The recording and a transcript of the interview were received as exhibits.

TBI Special Agent Michael Frizzell testified as an expert in call detail records analysis. He examined records of the cell phones associated with the Defendant and the codefendant. Agent Frizzle said all cell tower activity for the codefendant's phone from 4:01 p.m. on December 16, 2014 to 5:52 a.m. on December 17, 2014 was with the Fairgrounds Boulevard tower located near the codefendant's place of employment on

McCormick Avenue. He said her cell phone had no activity between 1:10 a.m. and 4:38 a.m. on December 17. He stated that at 7:42 and 7:48 a.m., her phone registered activity with the North Hardin Street cell tower located near the Defendant's home. He said that the Defendant's cell phone activity from 2:00 p.m. on December 16, 2017 to 8:00 a.m. on December 17, 2019 was with the North Hardin Street cell tower. Agent Frizzell identified the call detail record analysis he prepared related to the cell phones and used it to aid his testimony; however, the cell phone records and the report were not included in the record on appeal.

Greene County Sheriff's Captain John Key testified that he was second in command of the corrections division. He stated that Securis Technologies provided the inmate phone systems, that the system automatically recorded all calls, and that he was in charge of the system at the jail.

Captain Key said that on December 20, 2014, the Defendant made a call from the jail to his mother, Ms. Jones. In the recorded call, the Defendant told Ms. Jones that he left the victims at home with Mr. Lewis. The Defendant said that when he returned home, K.E. was asleep on the sofa and that T.T. was asleep in her bouncy chair. The Defendant stated that Mr. Lewis harmed the victims. Ms. Jones asked the Defendant why he did not tell the police about Mr. Lewis initially. Ms. Jones asked the Defendant to tell her exactly what happened. The Defendant explained that he left his home to deliver drugs to a woman, that he was gone approximately thirty minutes, that Mr. Lewis was watching television when the Defendant returned home, that K.E. was lying on the sofa, and that T.T. was in her bouncy chair. The Defendant said he did not know if the victims were alive because he did not check on them until Mr. Lewis left at approximately 3:00 a.m. The Defendant said that he checked on K.E. and realized she was not breathing. Ms. Jones told the Defendant that his story did "not add[] up right." She asked why Mr. Lewis would harm the victims, and the Defendant explained that Mr. Lewis was jealous of the Defendant's relationship with the codefendant. Ms. Jones then told the Defendant that the codefendant informed the police that the Defendant was not the biological father of either K.E. or T.T. and that Mr. Lewis was the victims' biological father. The Defendant replied, "Damn, wow." Ms. Jones said that the codefendant was "going against" the Defendant and that the Defendant needed to "quit holding off" for the codefendant. Ms. Jones encouraged the Defendant to tell the police everything he knew about the victims' deaths. Ms. Jones said that the Defendant would be "in this s--- by" himself and that the codefendant had already been caught telling multiple lies. Ms. Jones told the Defendant that he needed to tell the truth because the codefendant had already "started stabbing [the Defendant] in the back." The Defendant then told Ms. Jones that the codefendant killed K.E. and T.T. The Defendant explained that the codefendant told him she was "sick of" kids. He said that he called her to come home from work because K.E. was having a seizure. The Defendant said that the codefendant picked up K.E. and shook her until she stopped moving. He said that the codefendant did the same thing to T.T. The Defendant said he did not tell the police because the codefendant told him that she loved him and wanted to marry him. He

-12-

explained that the codefendant told him to instruct the police that Mr. Lewis killed the victims. The Defendant said that the codefendant arrived home from work at approximately 10:00 p.m., that she killed the victims at approximately 12:00 a.m., and that she told the Defendant to wait to call the police until she returned from work the following morning. He said that he did not call the police immediately after the codefendant killed the victims because he was "tripping" on Molly and bath salts. The Defendant stated that the codefendant gave him a tranquilizer to put him to sleep and that he took Molly to stay awake.

Captain Key testified that the Defendant made a recorded call from the jail on February 22, 2015. The call was played for the jury. During the call, the Defendant told the unidentified person on the call that this person needed to tell the Defendant's lawyer to have the codefendant take a lie detector test. He said that he had been willing to take a lie detector test but that he was told there was enough evidence to charge him, and he would not be taking a lie detector test. The Defendant said that K.E. and T.T. were crying the night they died and that the codefendant killed them. He also said that the codefendant gave him tranquilizers to put him to sleep and that he took Molly in order to stay awake.

Third Judicial District Criminal Investigator Teddy Collingsworth testified that he assisted in the investigation of the deaths of the victims. Investigator Collingsworth stated that on December 19, 2014, he interviewed witnesses in an attempt to corroborate the Defendant's statements but that he was unable to corroborate them. Investigator Collingsworth stated that on the evening of December 19, he, along with Agents Wilhoit and Lott, interviewed the Defendant. A recording of the interview was played for the jury. During the interview, the Defendant said that several people came to his home the night the victims died to purchase drugs, including Eureka Jordan, who he said "smoked dope" in his bathroom. The Defendant stated that he had left the victims with Mr. Lewis. The Defendant said he panicked when he realized the victims were dead because there were drugs in his home and he had been smoking marijuana.

GPD Detective Kenni Carter testified that on December 17, 2014, at approximately 8:00 a.m., he went to the Defendant's home. Detective Carter identified photographs of the Defendant's home, and they were received as exhibits. The photographs showed the living room couch on which the Defendant said he found K.E., the bouncy seat in which T.T. was found, a pan on the stove, a bottle of Pine-Sol, and a baby bottle. Detective Carter explained that upon arriving at the home, he did not have a theory for the cause of the victims' deaths and that he examined the home for an "environmental reason" that could have harmed the victims. Detective Carter said that he suspected that the boiling Pine-Sol might have killed the victims.

Detective Carter testified that he returned to the Defendant's home, accompanied by the Defendant. Detective Carter explained that he made a video recording during the visit, and the recording was played for the jury. In the video, the Defendant told Detective

Carter that he found K.E. around 7:00 a.m. lying on her stomach on the couch. The Defendant said he removed her blanket and saw that her skin was blue. The Defendant said he also noticed "spotting" in K.E.'s ear. The Defendant told Detective Carter that he placed T.T. in her bouncy seat at approximately 11:00 p.m. after the codefendant left the house and that he awoke and fed T.T. at 5:00 a.m.

Detective Carter testified that Agent Lott created a summary of phone records related to the Defendant's phone that included text messages sent from the Defendant's phone to the codefendant's phone. Detective Carter said that he confronted the Defendant with the contents of a text message sent from the codefendant's phone to the Defendant's phone at 11:35 p.m. which said, "I love you very much. Goodnight, babe." Detective Carter stated that the Defendant said the codefendant accidentally sent that message to the Defendant, but she intended to send it to her father. Detective Carter stated the phone pinged off the Fairgrounds Boulevard cell tower. Detective Carter identified a second text message sent from the Defendant's phone to the codefendant's phone, which read: "I love you more, night, babe." Detective Carter stated that this phone pinged off the Highland Avenue cell tower. Detective Carter said the Defendant's phone was next used to call the codefendant's phone at 5:48 a.m. Detective Carter said that according to the Defendant's statement, the codefendant was at home with the Defendant when the Defendant received the text messages from the codefendant. Detective Carter said that he attempted to corroborate the content of the Defendant's statements but was unable to corroborate that anyone else was in the home besides the Defendant between midnight and 6:00 a.m.

Forensic pathology expert Dr. Darinka Mileusnic-Polchan testified that she read the victims' autopsy reports and medical records and attempted to narrow the victims' time of death. She explained that she reviewed the rectal body temperatures of the victims at the time they arrived at the emergency room because these were the only objectively recorded findings regarding the victims. Dr. Mileusnic-Polchan said that the victims' records contained no mention of seizures or any sickness on the day the victims died. Dr. Mileusnic-Polchan stated that the records reflected that K.E.'s rectal temperature was 90.5 Fahrenheit and T.T.'s rectal temperature was 90.6 Fahrenheit. Dr. Mileusnic-Polchan explained that one of the first responders to the victims' home stated that the temperature inside the home was "very comfortable," and she used this description of the home temperature to establish the "ambient temperature" of the victims inside their home. She explained that a normal body temperature is 98.6 and that she assumed the victims' body temperatures were 98.6 at the time they died. Dr. Mileusnic-Polchan explained that, generally within the first six hours after death, body temperature decreases approximately two degrees Fahrenheit each hour. She said she concluded that based on ambient temperature and the victim's rectal temperatures, the victims died at approximately 3:00 or 4:00 a.m., plus or minus one hour.

TBI Special Agent Forensic Scientist Melanie Carlisle testified that she reviewed the recording of a jail telephone call related to this case. Agent Carter said that clonazepam,

a central nervous system depressant, was discussed during the call. She explained that the drug caused sedation and could decrease motor skills. Agent Carter stated that once ingested, the effects of clonazepam occurred within a couple of hours and could last for six to eight hours. Agent Carter said that bath salts and "Molly," which were also mentioned in the call, were nervous system stimulants and had psychoactive effects, including insomnia, agitation, and hallucinations. She stated that once ingested, the side effects of the drug peaked within a few hours and lasted for several hours. Agent Carter explained that after the effects wore off, the person experienced a "crash phase" and felt sedated. Following this testimony, the State rested its case.

Forensic pathology expert Dr. William Oliver testified on behalf of the Defendant. Dr. Oliver said that he reviewed Dr. Scheuerman's autopsy reports of the victims and Dr. Mileusnic-Polchan's report regarding determination of time of death. Dr. Oliver explained that using cooling body temperature to ascertain a time of death was "extraordinar[il]y bad." He stated that it was not standard procedure for medical examiners to take a body temperature during an autopsy for determining time of death because the result could be misleading and unreliable. Dr. Oliver stated that he had worked with Dr. Mileusnic-Polchan and that body temperature was not routinely taken.

Captain Key was called by the defense and testified that the Defendant called the codefendant from jail on November 12, 2014. A recording of the call was played for the jury. During the call, crying could be heard in the background, and the codefendant said, "[K.E.], I'm about to beat your a--." The codefendant told the Defendant that she had had "a rough morning." The codefendant said, "[T.T.], you've got to shut up. All this baby does is f---ing cries, and cries, and cries, and cries, and cries, and cries." The Defendant told the codefendant to "chill out" and "stop yelling at my kids." The Defendant told the codefendant that he would be home soon, to which the codefendant replied, "I hope so because I am about to lose my mother f---ing mind." The codefendant then said, "You're just going to have to cry, [T.T.]. F--- it." The Defendant again asked the codefendant to calm down and said he would be home soon to help her. The codefendant replied that the Defendant was not the one who did not "get no f---ing sleep" and then had to "listen to it all g-- d--n day." The Defendant asked the codefendant to be patient and reminded her that he would be home in four days.

Lenetta Miller testified that she knew the Defendant and the codefendant. Ms. Miller said that she observed the Defendant interacting with K.E. and T.T. and that he was attentive to the children and made sure they were okay. Ms. Miller stated she observed that the codefendant was "aggravated," "mad easy," and "upset" around the victims. Ms. Miller explained that she saw the codefendant three or four times after the victims' deaths. She said that the codefendant appeared "nonchalant like" and did not cry or appear emotional.

-15-

Eureka Jordan testified that she had been neighbors with the Defendant and the codefendant. Ms. Jordan said that the Defendant took "very good care" of the victims. Ms. Jordan stated that on one occasion she entered the Defendant's home and observed the codefendant shaking K.E. Ms. Jordan used her hands to display a back and forth motion. Ms. Jordan explained that she saw the codefendant at the hospital after the victims had died. She said the codefendant stood outside, smoked, and showed "no tears or nothing." Ms. Jordan stated that she thought the codefendant was abnormal because the codefendant did not appear to be emotional.

During cross-examination, Ms. Jordan testified that she was not in the Defendant's home on December 16, 2014, and that if someone said she used drugs in the Defendant's bathroom that night, it would be a lie. Ms. Jordan said that on the morning the victims died, the Defendant called her and asked her if she had $150 she owed him. Ms. Jordan stated that she spoke with the Defendant several times over the next few days and that he told her he needed the money because he needed to leave town. Ms. Jordan said that the Defendant also asked Ms. Jordan to call another person who owed the Defendant money. Ms. Jordan explained that she used drugs in 2014 and that the drug use affected her memory.

Adonte Lawson testified that he had lived with his mother, Eureka Jordan, and that they had been neighbors with the Defendant and the codefendant. Mr. Lawson said that his family was close to the Defendant, the codefendant, and the victims and that he saw them often. Mr. Lawson stated that the Defendant took care of the victims.

Upon this evidence, the jury convicted the Defendant as follows: Count One, facilitation of felony murder in the perpetration of aggravated child abuse of K.E.; Count Two, facilitation of felony murder in perpetration of aggravated child neglect of K.E.; Count Three, facilitation of felony murder in perpetration of aggravated child abuse of T.T.; Count Four, facilitation of felony murder in perpetration of aggravated child neglect of T.T.; Court Five, aggravated assault of K.E.; Court Six, aggravated child neglect of K.E.; Count Seven, aggravated assault of T.T.; and Count Eight, aggravated child neglect of T.T. Following a sentencing hearing, the trial court imposed an effective fifty-year sentence. This appeal followed.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence does not support his convictions. Specifically, he argues that there was no evidence he knowingly furnished substantial assistance to the codefendant in the commission of the offenses. He also argues that his inaction did not cause the harm to the victims. The State responds that the evidence is sufficient to support the convictions.

-16-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see State v. Vasques,* 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques,* 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall,* 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton,* 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-202(a)(2) provides, in pertinent part, that first degree felony murder is a "killing of another committed in the perpetration of or attempt to perpetrate" aggravated child abuse or aggravated child neglect. Facilitation of felony murder is a lesser included offense of felony murder. *State v. Ely*, 2001 48 S.W.3d 710 (Tenn. 2001).

A person commits the offense of aggravated child abuse, who commits child abuse, as defined in section 39-15-401(a), and the abuse results in serious bodily injury to the child. T.C.A. section 39-15-402(a)(1). Tennessee Code Annotated section 39-15-401(a) provides that any "person who knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony."

A person commits the offense of aggravated child neglect, who commits child neglect, as defined in section 39-15-401(b), and the neglect "results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). Tennessee Code Annotated section 39-15-401(b) provides that any "person who knowingly . . . neglects a child under eighteen years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight years of age or less, the penalty is a Class E felony."

Tennessee Code Annotated section 39-13-102(a)(1)(A)(i) provides, in pertinent part, that a person commits aggravated assault who "intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault" "[r]esults in serious bodily injury."

A person commits assault who intentionally or knowingly causes bodily injury to another. *Id.* § 39-13-101(a)(1).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony," but without intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, "the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-402(2) (facilitation of a felony); -11-403(a) (criminal responsibility); *see State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996). Knowing "refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

"Mere presence during the commission of a crime is not enough to convict." *State v. Jones*, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999). A defendant's criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982).

**A. Offenses Related to K.E.**

The Defendant was convicted of the following offenses related to K.E.:

Count One – facilitation of felony murder in the perpetration of aggravated child abuse

Count Two – facilitation of felony murder in the perpetration of aggravated child neglect

Count Five – aggravated assault

Count Six – aggravated child neglect

Relative to facilitation of felony murder in the perpetration of aggravated child abuse, the evidence viewed in the light most favorable to the State shows that the codefendant shook K.E., causing serious bodily injury. However, no evidence shows that the Defendant was aware of the codefendant's intent to commit the offense. *See* T.C.A. § 39-11-403(a) (criminal responsibility for facilitation of a felony requires that a defendant know "that another intends to commit a specific felony"). Although the evidence showed that the Defendant was present and witnessed the attack, the State did not adduce proof to show that the Defendant knowingly furnished substantial assistance to the codefendant in her commission of the felony. *See id.* (requiring that the defendant provide substantial assistance to the principal actor in the commission of the felony). In this regard, we note

-18-

that the State did not show the length of the codefendant's attack on K.E., during which time the Defendant might have provided substantial assistance, either by action or inaction. In any event, the Defendant's mere presence is insufficient to support a conviction. *See Jones*, 15 S.W.3d at 890. The evidence is insufficient for a rational jury to find that the Defendant committed the offense of facilitation of felony murder in the perpetration of aggravated child abuse of K.E.

Turning to facilitation of felony murder in the perpetration of aggravated child neglect, the evidence shows that the codefendant shook K.E. until she was motionless, that the Defendant and the codefendant "knew" K.E. was dead, and that they "freaked out" and did not call the authorities. Although the evidence shows aggravated child abuse by the codefendant, it does not show that the codefendant knowingly neglected K.E. so as to adversely affect her health or welfare. *See* T.C.A. § 39-15-401(b). The evidence shows that the codefendant's actions quickly resulted in K.E.'s death. In his statement, the Defendant said that K.E. was motionless when the codefendant stopped shaking her and that he and the codefendant knew K.E. was dead. No evidence shows the length of time of the codefendant's attack on K.E., that immediate medical intervention would have resulted in successful resuscitation of K.E., or that K.E. died due to neglect, as opposed to or in addition to the shaking abuse. The medical examiner testified that the injuries caused "spinal shock" and "rapid" death. Thus, the evidence does not show that the codefendant committed aggravated child neglect, resulting in K.E.'s death. The evidence is insufficient for a rational jury to find that the Defendant committed the offense of facilitation of felony murder in the perpetration of aggravated child neglect.

With regard to the Defendant's conviction for aggravated assault of K.E., we note the absence of evidence that the Defendant was guilty as the principal actor in an assault on K.E. However, a conviction may rest upon a theory of criminal responsibility for the conduct of another. In order to be criminally responsible for an aggravated assault perpetrated by the codefendant, the evidence must show that the Defendant had the "intent to promote or assist in the commission of the offense, or to benefit in the proceeds of the offense" and that he solicited, directed, aided, or attempted to aid the codefendant in the commission of the offense. *See id.* § 39-11-402(2). Viewed in the light most favorable to the State, the evidence does not show that the Defendant intended to promote or assist in the codefendant's assault of K.E. or that he aided the codefendant in her perpetration of an aggravated assault of K.E. No evidence reflects that the Defendant knew the codefendant intended to assault K.E. The evidence is insufficient to support the aggravated assault conviction.

We have considered whether the evidence is sufficient to support a conviction of the lesser included offense of facilitation of aggravated assault but conclude that it is not. The Defendant, again, would have had to know that the codefendant intended to commit aggravated assault, and the record contains no proof in that regard. *See id.* § 39-11-403(a).

Regarding the Defendant's conviction of aggravated child neglect of K.E., we again note the lack of evidence that immediate medical intervention would have resulted in successful resuscitation of K.E. or that K.E. died due to neglect, as opposed to or in addition to abuse. The evidence does not support the Defendant's conviction for aggravated child neglect of K.E., either as the principal actor or under a theory of criminal responsibility.

We conclude that the evidence is insufficient to support the Defendant's convictions for the charges involving K.E. in Counts One, Two, Five, and Six. These convictions are reversed, and the charges dismissed.

## B. Offenses Related to T.T.

The Defendant was convicted of the following offenses related to T.T.:

Count Three – facilitation of felony murder in the perpetration of aggravated child abuse

Count Four – facilitation of felony murder in the perpetration of aggravated child neglect

Count Seven – facilitation of aggravated assault

Count Eight – aggravated child neglect

With regard to facilitation of felony murder of T.T. in the perpetration of aggravated child abuse, the evidence viewed in the light most favorable to the State shows that the Defendant had just witnessed the codefendant shake K.E. until she stopped moving with such force that K.E's spinal cord separated from her brain stem, that the Defendant knew K.E. had died, that the codefendant refused his suggestion to call the authorities once they realized that K.E. was dead, and that he and the codefendant "freaked out." Nevertheless, the Defendant took no action to stop the codefendant when she picked up and began shaking T.T. and continued for a couple of minutes. Although he eventually took T.T. from the codefendant and placed her in a bouncy seat, a couple of minutes passed before the Defendant intervened, allowing the codefendant time to inflict fatal injuries on T.T. Moreover, during a recorded jail call that occurred approximately one month before the victims' deaths, crying was heard in the background, the codefendant yelled at the victims, and the codefendant told the Defendant that she was "about to lose her . . . mind." The Defendant also told his mother that the codefendant was "sick of kids." From this evidence, a rational jury could conclude that the Defendant knew, based upon the codefendant's earlier abuse of K.E. and the Defendant's knowledge of the codefendant's frustration with the victims, that the codefendant intended to commit aggravated child abuse of T.T. A rational jury could conclude, as well, that the Defendant furnished substantial assistance in the commission of the felony by failing to intervene before the codefendant inflicted the

fatal injury upon a subsequent victim. A jury could reasonably infer that the Defendant knew what the codefendant was going to do after she picked up T.T., and yet the Defendant waited a couple of minutes to intervene. The evidence is sufficient to support the Defendant's conviction for facilitation of felony murder in the perpetration of aggravated child abuse of T.T.

Next, we consider the conviction for facilitation of felony murder in the perpetration of aggravated child neglect. Viewed in the light most favorable to the State, the evidence shows that the codefendant violently shook T.T. Although the evidence is sufficient to show aggravated child abuse by the codefendant, it does not show that the codefendant knowingly neglected T.T. so as to adversely affect T.T.'s health or welfare beyond the abuse that caused the fatal injury. *See id.* § 39-15-401(b). The evidence shows that the codefendant inflicted a fatal injury on T.T. through physical abuse, not neglect. The Defendant said that after the codefendant stopped shaking K.E., he and the codefendant knew K.E. was dead. The codefendant then shook T.T. in a similar manner causing the same injury, a severed spinal cord. No evidence shows that immediate medical intervention would have resulted in successful resuscitation of T.T. or that T.T. died due to neglect, as opposed to or in addition to abuse. The medical examiner testified that the injuries caused "spinal shock" and "rapid" death. Thus, the evidence is insufficient to show that the codefendant committed aggravated child neglect that resulted in T.T.'s death. The Defendant cannot, therefore, be convicted on this evidence of facilitation of felony murder in the perpetration of aggravated child neglect of T.T.

Turning to the Defendant's conviction of facilitation of aggravated assault of T.T., the evidence viewed in the light most favorable to the State shows that when the codefendant picked up T.T. and began shaking her, the Defendant knew the codefendant intended to assault T.T. in a manner which would inflict serious bodily injury, given his knowledge of the prior assault on K.E. The evidence shows, as well, that the Defendant knowingly furnished substantial assistance to the codefendant by failing to intervene in the aggravated assault of T.T. for a couple of minutes. The evidence is sufficient to support the Defendant's conviction for facilitation of aggravated assault of T.T.

In reaching this conclusion regarding the conviction for facilitation of aggravated assault of T.T., we note the apparent inconsistency in the verdicts for Count Three, in which the Defendant was convicted of facilitation of felony murder in the perpetration of aggravated child abuse of T.T., and Count Seven, in which is the Defendant was convicted of facilitation of aggravated assault of T.T. In Count Seven, the Defendant was acquitted by the jury of aggravated child abuse of T.T. and of facilitation of aggravated child abuse of T.T. The guilty verdict was returned for facilitation of aggravated assault as a lesser included offense. Thus, the Defendant's acquittal of facilitation of aggravated child abuse in Count Seven is inconsistent with the jury's finding of guilt in Count Three relative to facilitation of felony murder in the perpetration of aggravated child abuse. We note, however, that inconsistent verdicts involving a predicate felony and felony murder are

permitted. *See State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015) (holding that inconsistent verdicts are permitted, whereby a defendant may be convicted of felony murder but acquitted of the predicate felony).

Finally, we turn to the Defendant's conviction of aggravated child neglect of T.T. Viewed in the light most favorable to the State, the evidence shows that the Defendant witnessed a violent assault on T.T. and did nothing to stop it for a couple of minutes. After the shaking stopped, he took the infant victim from the codefendant and placed T.T. in the bouncy seat. The Defendant knew the codefendant's assault against K.E. resulted in K.E.'s death, and yet the Defendant did nothing to ensure T.T.'s safety after the codefendant picked up T.T. The Defendant could have stopped the assault on T.T. immediately and sought medical assistance for T.T., but the Defendant chose to allow the codefendant to shake T.T. for a couple of minutes, by which time T.T. had suffered a fatal injury. The Defendant could have protected T.T. from the codefendant's conduct. From this evidence, a rational jury could conclude that the Defendant knowingly neglected T.T. in a manner that adversely affected her health or welfare. *See id.* § 39-15-401(b). Moreover, the Defendant's actions after the offense corroborate the Defendant's intent to promote or benefit from the results of the abuse that had occurred. After the codefendant inflicted injuries on K.E. and T.T., the Defendant remained in the home with the victims for several hours without calling the police or emergency medical service. The Defendant attempted to protect the codefendant, who said that she loved the Defendant and wanted to marry him, by blaming Mr. Lewis for the victims' deaths in multiple statements to police. Also, the Defendant said he wanted to leave the area and start over. The Defendant called Ms. Jordan the day after the victims died asking for money she owed him because the Defendant needed money to leave town. The same day, the Defendant and the codefendant pawned a stolen television, appeared to be happy, and looked at wedding rings. The Defendant's actions following the victims' deaths corroborate the Defendant's intent. The evidence is sufficient to support the Defendant's conviction for aggravated child neglect of T.T.

We conclude that the evidence is sufficient to support the Defendant's convictions involving T.T. in Counts Three, Seven, and Eight. The evidence is insufficient to support the Defendant's conviction involving T.T. in Count Four, and this conviction is reversed and the charge is dismissed.

## II. Photograph Evidence

The Defendant contends that the trial court erred in admitting autopsy photographs of the victims. Specifically, the Defendant argues that the photographs were not necessary because the cause of death was not an issue at the trial. He argues that the photographs were cumulative and highly prejudicial. The State responds that the court properly admitted the photographs of the victims.

-22-

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The trial court conducted a hearing to determine the admissibility of the autopsy photographs. The court ordered that several photographs be cropped to show injuries but not other parts of the victims. The court also excluded several photographs on the basis of lack of relevance. The court determined that the remaining photographs were relevant to aid Dr. Scheuerman's testimony. The court concluded that these photographs were not overly gruesome and that their probative value outweighed their prejudicial effect.

The State admitted thirteen autopsy photographs of K.E. and three autopsy photographs of T.T. The photographs depicted the victims' severed spinal cords and injuries to K.E.'s left eye, neck, mouth, head, back, and buttocks. The photographs assisted Dr. Scheuerman in explaining the victims' injuries and supported his conclusions regarding the victims' causes of death. None of the photographs were overly gruesome or unfairly prejudicial. The trial court did not abuse its discretion in determining that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this issue.

### III. Sentencing[2]

The Defendant contends that the trial court erred by imposing partial consecutive sentencing. Specifically, the Defendant argues that the trial court erred by not considering the factors set out in *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). The State responds that *Wilkerson* does not apply because *Wilkerson* is applicable when a court imposes consecutive sentences solely based on a finding that a defendant is a dangerous offender. The State argues that the trial court did not base its decision to impose consecutive service on the Defendant's being a dangerous offender and that the court acted within its discretion when it sentenced the Defendant.

At the sentencing hearing, First Tennessee Human Resource Agency Probation Officer Karen Brown testified that the Defendant was on probation for vandalism when the offenses occurred in December 2014.

Donna Green testified that she was the codefendant's mother. She stated that K.E. died at age fourteen months. Ms. Green said that K.E. spoke "simple baby words." She stated that K.E. was unable to call for help or tell someone that something was wrong. Ms. Green said that T.T. was age two months when she died.

The presentence report was received as an exhibit. The report stated the Defendant had multiple criminal convictions, including Arkansas convictions for breaking and entering and for theft. He attended school through the eleventh grade. The Defendant received mental health treatment as a child and had been prescribed multiple psychiatric medications. He began using marijuana at age nine, drinking alcohol at age fourteen, using Ecstasy and cocaine at age fifteen, and using Molly at age seventeen. The Defendant lived "on and off" with his grandparents and had occasional contact with his parents, who were "in and out" of jail for shoplifting and drug offenses. Multiple reports were filed with the Arkansas Department of Human Services regarding abuse and neglect of the Defendant, and subsequent investigations were either closed without action or with support services being provided to the Defendant's family.

The trial court considered the Defendant's presentence report, testimony of witnesses, arguments from counsel, exhibits reflecting the Defendant's prior convictions,

---

[2] We note that the court ordered the twenty-five-year sentence for the Defendant's convictions involving K.E. and the twenty-five-year sentence for the convictions involving T.T. to be served consecutively, for an effective sentence of fifty years. Despite our reversal and dismissal of the convictions in Counts One, Two, Four, Five, and Six, we will address the Defendant's sentencing issue due to the possibility of further review. *See*, *e.g.*, *Jacobs v. State*, 450 S.W.2d 581 (Tenn. 1970) (mem.) (stating that the immediate court erred by pretermitting its consideration of the remaining issues after concluding that error existed as to one issue); *State v. Pendergrass*, 13 S.W. 3d 389, 395 (Tenn. Crim. App. 1999) (concluding that, despite insufficiency of the evidence to support the convictions, an intermediate court must address the remaining issues).

and the evidence presented at the Defendant's trial. The court also considered the nature and circumstances of the Defendant's criminal conduct and the mitigating and enhancement factors. The court found that the Defendant was on probation for breaking and entering and for vandalism when the events in this case occurred. The court considered the evidence from the trial regarding the Defendant's use and sale of illegal drugs. The court determined in its review of enhancement factors that the Defendant had a history of criminal convictions and criminal behavior; that the victims were particularly vulnerable due to their age; that the Defendant allowed the victims to be treated with exceptional cruelty because of the nature of their injuries; that the Defendant was on probation when the offenses in this case were committed; and that the Defendant was the victims' caregiver and abused his position of private trust. T.C.A. §§ 40-35-114 (1), (4), (5), (13), (14). The court found that one mitigating factor applied because the Defendant had a background of parental separation, abuse, and neglect. *Id.* § 40-35-113(13). The court found that the enhancement factors outweighed the mitigating factor.

The trial court also considered factors set out in Tennessee Code Annotated section 40-35-102. The court determined that the Defendant had a clear disregard for the laws and morals of society and that past efforts of rehabilitation had failed because he committed the present offenses while on probation. The court considered Tennessee Code Annotated section 40-35-103 and found that confinement was necessary to protect society by restraining the Defendant because of his long history of criminal conduct, to avoid depreciating the seriousness of the offense, and to provide an effective deterrence to others. The court found that measures less restrictive than confinement had been frequently or recently applied unsuccessfully to the Defendant. Moreover, the Defendant was not eligible for probation. *See id.* § 40-35-303(a) (A defendant is eligible for probation if the sentence imposed is ten years or less, and no defendant convicted of a violation of § 39-15-402 shall be eligible for probation.)

The trial court sentenced the Defendant for his convictions regarding K.E. to serve twenty-five years' confinement for facilitation of felony murder in the perpetration of aggravated child abuse, twenty-five years' confinement for facilitation of felony murder in the perpetration of aggravated child neglect, four years' confinement for facilitation of aggravated assault, and twenty-five years confinement for aggravated child neglect. The court merged the two facilitation of felony murder convictions and ordered that all convictions involving K.E. run concurrently, for an effective sentence of twenty-five years.

The trial court sentenced the Defendant for his convictions regarding T.T. to serve twenty-five years' confinement for facilitation of felony murder in the perpetration of aggravated child abuse, twenty-five years' confinement for facilitation of felony murder in perpetration of aggravated child neglect, four years' confinement for facilitation of aggravated assault, and twenty-five years' confinement for aggravated child neglect. The court merged the two facilitation of felony murder convictions and ordered that all sentences involving T.T. run concurrently, for an effective sentence of twenty-five years.

The trial court found that partial consecutive sentencing was appropriate because the Defendant committed the offenses while on probation and that the Defendant had an extensive criminal history. *See id.* § 40-35-115(b)(2), (6). The court ordered the twenty-five-year sentence involving K.E. and the twenty-five-year sentence involving T.T. to be served consecutively, for an effective sentence of fifty years. The court also ordered the Defendant's sentence to be served consecutively to his Arkansas conviction.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the result of the validated risk and needs assessment conducted by the department and contained in the presentence report, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 40-35-115(b) provides in relevant part that a court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

. . . .

(2) The defendant is an offender whose record of criminal activity is extensive; [or]

. . . .

(6) The defendant is sentenced for an offense committed while on probation;

. . . .

*Id.*

The trial court considered the evidence presented at the trial and the sentencing hearing, the presentence report, the Defendant's criminal history, and determined the appropriate enhancement and mitigating factors. The court found that previous measures less restrictive than confinement had been unsuccessful. The court ordered the Defendant's sentences to be served consecutively because the offenses were committed while the Defendant was on probation and because the Defendant had an extensive criminal history, and the record supports the trial court's determinations. *Id.* § 40-35-115(b)(2), (6). Moreover, the trial court did not base its decision to impose partial consecutive service on the basis that the Defendant was a dangerous offender. *See id.* § 40-35-115(b)(4); *see also Wilkerson*, 905 S.W. 2d at 938 (holding that in imposing consecutive sentences based upon dangerous offender status, it is necessary to make findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses). Thus, *Wilkerson* does not apply, and contrary to the Defendant's argument, the *Wilkerson* findings were not required. The record reflects that the court properly applied the purposes and principles of the Sentencing Act in determining the Defendant's within range sentences. *See id.* § 40-35-112 (a)(1), (3) (Range I, Class A felony carries a sentence of fifteen to twenty-five years; Range 1, Class B felony carries a sentence of eight to twelve years; a Range I, Class C felony carries a sentence of three to six years; and a Range 1, Class D felony carries a sentence of two to four years). The Defendant is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, we affirm the Defendant's convictions for Count Three, facilitation of felony murder in the perpetration of aggravated child abuse of T.T.; Count Seven, facilitation of aggravated assault of T.T.; and Count Eight, aggravated child neglect of T.T. We reverse the Defendant's convictions for Count One, facilitation of felony murder during the perpetration of aggravated child abuse of K.E.; Count Two, facilitation of felony murder during the perpetration of aggravated child

-27-

neglect of K.E.; Count Five, aggravated assault of K.E.; Count Six, aggravated child neglect of K.E.; and Count Four, facilitation of felony murder during the perpetration of aggravated child neglect of T.T. The charges for Counts One, Two, Four, Five, and Six are dismissed. The Defendant shall have an effective sentence of twenty-five years.

_____
ROBERT H. MONTGOMERY, JR., JUDGE